Filed 4/3/14  K.E.v.Super. Ct. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| K. E. et al.,<br><br>    Petitioners,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G049458<br><br>(Super. Ct. Nos. DP023004 & DP023005)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Kimberly Menninger, Judge.  Petition denied.

Law Office of Chandler Parker and Chandler A. Parker for Petitioners.

No appearance for Respondent.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Offices of Harold LaFlamme and Linda O'Neil, for Real Parties in Interest A.E. and Zachary E.

* * *

**INTRODUCTION**

Petitioners Krystal E. and K.E., the parents of minors A.E. and Zachary, lost custody of their children to Orange County Social Services Agency (SSA) in April 2013. Although SSA wanted to return the children to their parents' care, asking only that the parents provide a residence address and a chance for SSA to inspect the home for cleanliness and safety, Krystal and K.E. simply refused to comply. As a result, the juvenile court had no choice but to vest the children's custody in SSA.

Krystal and K.E. appealed from this order, and we affirmed in an unpublished opinion.[1] While the appeal was being considered, the wheels of the dependency system ground on, as the statutory review periods elapsed. Although SSA prepared a case plan for them in December 2012, Krystal and K.E. did nothing to implement it. They likewise did nothing to overcome the problems that led to the initial removal. For example, they never provided an address of a residence SSA could inspect. They did not participate in the mental health evaluations ordered by the court in April 2013. They never met with SSA to discuss their case plan or anything else. After January 2013, they did not even visit A.E. and Zachary, limiting their contact with the children to telephone calls. And they absented themselves completely from court proceedings.

Despite repeated warnings from the juvenile court as to the probable effect of their conduct, Krystal and K.E. persisted in their refusal to engage with SSA and the court before the 12-month review hearing. As could have been predicted, the juvenile court found that returning A.E. and Zachary, now thriving in foster care, to their parents

---

[1]     *In re A.E.* (Jan. 7, 2014, G048385) [nonpub. opn.].)

2

would create a substantial risk of detriment to the children's safety and well-being, seeing as how the parents had addressed none of the problems that had caused the original detention. The court terminated reunification services, which Krystal and K.E. had completely ignored. As required by statute, the court set a hearing under Welfare and Institutions Code section 366.26.[2]

Krystal and K.E. have petitioned this court to vacate the order setting a hearing under section 366.26. We interpret this request as one to reverse the juvenile court's order under section 366.21, subdivision (f), terminating reunification services, and to stay the hearing under section 366.26.

We deny the petition. The court had ample evidence for its findings pursuant to section 366.21, particularly as Krystal and K.E. made no effort whatsoever to comply with their case plan or avail themselves of reunification services, starting with counseling. They were at the end of the 12-month review period in exactly the same place as they were when the children were detained in September 2012. SSA and the court still did not know where they lived, and they had not even addressed – let alone ameliorated or resolved – the problems that brought A.E. and Zachary into the dependency system.

We often encounter parents resistant or antagonistic to county services, but for some unfathomable reason, Krystal and K.E. have chosen unremitting intransigence as their own case plan for their children. This is the consequence.

---

[2]     All further statutory references are to the Welfare and Institutions Code.

3

## FACTS

A detailed recounting of the facts that brought A.E. and Zachary to the attention of SSA can be found in our previous opinion and does not need to be reiterated here. Briefly, A.E. and Zachary were detained in September 2012 after school officials spotted some serious discrepancies in their school records. The police were notified, and a subsequent search of the children's residence revealed extremely dirty and unsanitary living conditions as well as easy access to weapons and ammunition. But what really set this case apart was the attitude and actions of the parents. From the beginning Krystal and K.E. acted in ways that the juvenile court aptly characterized as "extraordinarily unusual and not normal."

Although SSA was more than willing to release the children to their parents' custody, Krystal and K.E. thwarted every effort the agency made to inspect their residence. Even more mystifying, the parents never really established an address, which kept shifting with the ebb and flow of the dependency proceedings – now in Corona, now in Los Angeles, now in Beverly Hills.

Krystal in particular exhibited most peculiar behavior. For example, she had fixed in her mind that Zachary had numerous food allergies and sensitivities. As a result, he was significantly underweight, a condition that steadily improved in SSA's custody after it was determined he did not have the digestive problems she attributed to him. Krystal claimed to be a doctor, but refused to divulge her field of expertise or where she practiced. Her testimony as a witness at the jurisdiction hearing was nothing short of alarming. She either explicitly refused to divulge or claimed to be unable to remember significant facts of her life. Even more alarming, after testifying for a few hours, she, and K.E. with her, absented themselves from the remaining 15 days of trial and – according to the record before us now – have not appeared in court since that first day. They have also not visited their children since January 2013.

4

A.E. and Zachary went to foster care in April 2013, and the juvenile court found jurisdiction on April 16, 2013. The court gave SSA custody of the children. Krystal and K.E. appealed from this order, and we affirmed it in January 2014.

At the conclusion of the jurisdiction and disposition hearing in April, the court ordered mental health evaluations for both parents. The court appointed an expert to conduct the evaluations and issue a report. Although the expert tried to contact the parents to set up the examinations, neither one would cooperate. Accordingly, no evaluations were ever performed.

SSA prepared a case plan in December 2012. The case plan was updated for the October 8, 2013, six-month review hearing. Both case plans included requirements that the parents undergo counseling and, if necessary, psychological assessments. Neither parent complied with this portion of the case plan. The plan also required the parents to "inform the assigned social worker of any difficulties in completing the case plan as soon as they occur so as to allow the assigned social worker the opportunity to assist you in finding ways to overcome said difficulties." The record does not reflect any contact from the parents regarding difficulties in completing their case plan.

At the six-month review hearing on October 8, SSA reported that neither Krystal nor K.E. had made any progress on their case plan or participated in any services. Their court-appointed mental health expert had asked to withdraw because he was unable to schedule an appointment with either parent, despite conversations with their counsel. Most of the letters SSA had sent to the parents, including ones sent to the address provided by their counsel as his own, had been returned as unclaimed. The parents would not meet with SSA to discuss their case plan. Although SSA mailed multiple copies of the case plan to both parents, neither one returned a signed copy.

The juvenile court was very clear in October about the consequences of the parents' lack of compliance. "They will not get their children back if they are not

5

visiting.  They will not get their children back if the house can't be cleared.  They will not get the children back if we don't know where they live.  I mean, these are just basic, and if they don't work the plan."[3]

At the 6-month review hearing, the court set the 12-month review hearing for November 7, 2013.  Parents' counsel did not object to this date.

At the hearing on November 7, the case was continued yet again while arrangements were made to allow the children to visit newly discovered relatives in Michigan[4], who were willing to take them in, and to allow Krystal's mother to once more try to qualify for relative placement.[5]

On December 11 and 12, 2013, the juvenile court held the 12-month review mandated by section 366.21, subdivision (f).  Consistent with all hearings since the first day of the jurisdiction trial, the parents were not present.  Their counsel did not object to the hearing going forward on December 11, and cross-examined the social worker.  At the end of the hearing, the court identified its purpose – to decide whether SSA should continue to provide reunification services for Krystal and K.E. – from which subject testimony and argument had somewhat wandered.  The court found that Krystal and K.E. had made no progress whatsoever toward alleviating or mitigating the circumstances necessitating the children's placement with SSA.  It terminated reunification services,

---

[3] Krystal and K.E. were not present at this hearing, so the message was delivered to their counsel, for conveyance to them.

[4] The court received a letter from K.E.'s brother and sister-in-law stating that they had been trying to find K.E. for nearly 15 years.  They succeeded when his arrest in September 2012 in connection with this case turned up on the internet.

[5] At the hearing, Krystal's mother represented herself as willing to submit to a background check for relative placement on the spot.  She and the social worker walked over to Orangewood to perform the check. When they got there, the grandmother was asked for identification, which she stated she did not have.  The social worker obtained a waiver of identification, based on the grandmother's presentation of herself to the court.  Then the grandmother refused to be checked, stating that she wanted to be checked in Los Angeles; she had just complained to the court that the Los Angeles facility had lost her results, impeding relative placement for the children.  Upon being urged to perform the check at Orangewood, she stated she would return there the next day, declined to make an appointment, and never showed up.

6

found that return of the children to their parents would create a substantial risk of detriment, and ordered a permanent placement hearing under section 366.26 in 120 days.

Krystal and K.E. had petitioned to have the order setting the hearing under section 366.26 reversed for lack of evidence of substantial risk of detriment and reasonable reunification services.[6]

## DISCUSSION

Section 366.21, subdivision (f), provides in pertinent part: "The permanency hearing shall be held no later than 12 months after the date the child entered foster care, as that date is determined pursuant to Section 361.49.[7] At the permanency hearing, the court shall determine the permanent plan for the child, which shall include a determination of whether the child will be returned to the child's home and, if so, when, within the time limits of subdivision (a) of Section 361.5. After considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . . The court shall also determine whether reasonable services that were designed to aid the parent or legal guardian to overcome the problems that led to the

---

[6] Petitioners have also asserted that their due process rights were violated because the 12-month review hearing was held too soon after the 6-month review hearting. Petitioners' counsel did not raise this objection at any time before or during the 12-month review hearing and, in fact, their counsel participated in the hearing without an objection as to its timing. (As usual, they were not themselves present at the hearing.) Any due process claim they might have had is waived. (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222.) Likewise, petitioners have no standing to claim the children did not get proper notice of any proceedings. If such an irregularity occurred, only the children, through their counsel, can raise it. (See *In re Desiree M.* (2010) 181 Cal.App.4th 329, 333.)

[7] Section 361.49 provides, "Regardless of his or her age, a child shall be deemed to have entered foster care on the earlier of the date of the jurisdictional hearing held pursuant to Section 356 or the date that is 60 days after the date on which the child was initially removed from the physical custody of his or her parent or guardian." A.E. and Zachary were removed from their parents' physical custody on September 7, 2012. The jurisdiction hearing commenced in February 2013 and concluded in April 2013. 60 days from the children's initial removal was November 6, 2012.

7

initial removal and continued custody of the child have been provided or offered to the parent or legal guardian. . . . The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental.  In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5, shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided, taking into account the particular barriers to an incarcerated, institutionalized, detained, or deported parent's or legal guardian's access to those court-mandated services and ability to maintain contact with his or her child, and shall make appropriate findings pursuant to subdivision (a) of Section 366."

Our review of the juvenile court's order has a very narrow focus.  We do not re-evaluate the evidence, and we do not examine every incident that happened before the court issued its order.  Instead, we examine the record to ascertain whether substantial evidence supports the court's determination that returning the child to his or her parent would create a substantial risk of detriment to the child.  (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.)  "[W]e review the record in a light most favorable to the judgment and must uphold the trial court's findings unless it can be said that no rational factfinder could reach the same conclusion.  [Citation.]"  (*In re Heather B.* (1992) 9 Cal.App.4th 535, 563.)  We also look to see whether the parent had made substantive progress in court-ordered treatment programs, because failure to do so is prima facie evidence that return would be detrimental.  (§ 366.21, subd. (f).)

Substantial evidence supports a prima facie case that returning A.E. and Zachary to their parents would be detrimental to them.  Neither Krystal nor K.E. has made the slightest effort to comply with the aspects of the case plan concerning mental health evaluation and counseling.  In fact, they have deflected every effort made by SSA

8

to help them to comply. They refused to make appointments with the court-appointed expert designated to assess their mental health and to suggest appropriate therapy.

Krystal and K.E. also failed to comply with the visitation provisions.[8] Although they kept up telephone contact with their children, albeit not always positively, they had not visited for nearly a year when the juvenile court made its ruling. Krystal's excuse – that her counsel had told her not to visit – appears extremely unlikely to be true, especially in light of the court's frequent admonitions to their counsel that the parents needed to get with the program. If the visitation schedule did not suit them, neither parent ever contacted SSA to try to set up some other schedule. In fact, neither parent ever contacted SSA about anything, so far as the record reveals. Every contact was initiated by SSA, and usually the parents either ignored the message or directed SSA to speak to their attorney.

"In deciding whether it would be detrimental to return a child, the easy cases are ones where there is a clear failure by the parent to comply with material aspects of the service plan." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.) Krystal's and K.E.'s failure to take even the first step toward a court-ordered treatment program required the court to find the ultimate fact of detriment in the absence of other evidence. (*In re Heather B., supra,* 9 Cal.App.4th at p. 561.) "In section 366.21, subdivision (f), the Legislature has determined that the failure of a parent or guardian to participate regularly in any court-ordered treatment programs is sufficient, in the absence of other evidence, to support a finding that a return to parental custody would create a substantial risk of detriment to the child. Since court-ordered treatment programs are tailored by the court to remedy the circumstances that required removal of the child from

___

[8] The excuse offered for not visiting was the outstanding warrant for Krystal's arrest, which the court had issued in February 2013, after Krystal failed to appear to testify at the jurisdiction hearing. As the court pointed out: (1) there was no warrant against K.E., so he could visit; (2) the judge had repeatedly stated that she would not take Krystal into custody if she appeared pursuant to the warrant; and (3) even though the court and counsel had gone over this issue several times and counsel had conveyed the court's assurances to the clients, they still were not visiting.

parental custody, it is reasonable to conclude that in the absence of contrary evidence the failure to participate in such programs is sufficient to establish that the circumstances still exist." (*Ibid.*) Krystal and K.E. provided no contrary evidence, either that the programs were inadequate or that they had solved the problems that had prompted the initial detention such that returning the children to them would involve no risk or detriment. As far as this record shows, their situation in December 2013 was exactly as it was in September 2012 except that they had added a layer of antisocial resistance to the equation. Returning the children to their care would expose them to conditions no better than the ones they experienced in September 2012.

Krystal and K.E. also challenge the reasonableness of the reunification services offered to them. "The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

The argument in the parents' petition that counseling services were not tailored to their needs is, to put it mildly, specious. Without an initial evaluation, it would be impossible to tell what kind of counseling or parenting classes the parents needed or where they should be focused. Krystal unquestionably had some bizarre ideas, and K.E. was, so far as this record reveals, almost totally missing in action. In light of the parents' complete refusal to cooperate with the initial portions of the plan, they cannot now be heard to complain that it did not meet their needs.

Krystal and K.E. cannot absent themselves from the reunification process and then use their absence as evidence of compliance. They cannot use their failure and refusal to allow SSA to inspect their home – wherever it may be – to argue that SSA has no evidence that their home is unsuitable. They cannot argue from their failure to participate in a court-ordered mental health evaluation that they are mentally fine, or at least SSA has no evidence of mental problems. Their failure to participate even minimally in their case plan established a prima facie case of detriment that had to be

10

countered with positive evidence from them, not arguments about lack of evidence from SSA.

As the juvenile court put it, "[T]he mystery continues." All Krystal and K.E. had to do in the fall of 2012 to get their children back was to let SSA inspect their home. After SSA had assured itself that the children were living in a safe and clean environment, they would have been released to their parents. Instead, because Krystal and K.E. refused this simple request, they lost custody of two children who are clearly attached to them and want to be with them. Now they are heading into a hearing under section 366.26, which may permanently separate them from the children.[9] No one – not the juvenile court, not SSA, not this court – can account for the way this has turned out, and efforts to get to the bottom of the situation have failed.

Given the detachment from both their children and from the entire reunification process shown by Krystal and K.E., substantial evidence supports the juvenile court's determination that returning the children to their parents would create a substantial risk of detriment. SSA made reasonable services available to Krystal and K.E., services that they completely ignored. SSA is not required to compel parents to take advantage of the services offered. (See, e.g., *In re Lynna B.* (1979) 92 Cal.App.3d 682, 701; *In re Christina L.* (1992) 3 Cal.App.4th 404, 414.) Krystal's and K.E.'s refusal to participate established the prima facie case of detriment; they offered no countervailing evidence. The juvenile court made the right decision.

---

[9] Although Krystal and K.E. have argued in their petition that "termination of [their] parental rights . . . would constitute a miscarriage of justice," their rights have not been terminated. The hearing under section 366.26 has not taken place, and, from the record before us, it appears that long-term foster care may be the most likely outcome of this hearing. We therefore do not reach any issue regarding termination of parental rights.

11

## DISPOSITION

The petition for extraordinary relief and request for stay are denied.

Petitioners' request for judicial notice is denied.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.